Thank you, Your Honor. Good morning, and may it please the court. Nathan Roberts here on behalf of the appellants, the estate of Dustin Willard and his parents. I'm going to attempt to reserve four minutes for rebuttal, and we'll watch the clock. We're asking this court to reverse the District Court's erroneous grant of summary judgment and the erroneous exclusion of the human factors expert, Joellen Gill. This is a tragic case, and I'd like to talk just briefly about the human factors expert, Joellen Gill. I'm going to try to be as polite and most favorable to my client as they must be here and as they should have been at the District Court level. Dustin Willard, a young man, a homeowner, a hardworking blue collar young gentleman with no criminal history and nothing in the record to suggest he had a mental health problem or any animosity whatsoever to the police, hears rustling around the outside of his home at 130 in the morning, has no reason to and because he hasn't called the police, and hearing noises on his front porch opens the door to his home within his rights to do so, bearing a 12-gauge shotgun, hears some yelling, and before he has time and an opportunity to understand who is yelling or why they're yelling at him, 18 .40 caliber bullets have riddled him in the front of his home, and he dies there that day. Those are the facts of our case taken in the light most favorable to my client, the appellant. But the problem is that we have to look at this from the point of view of the police, do we not, in terms of the issue that's presented here? Of course we do, and I think that's a great point and a great segue. Reasonable police officers on scene knew and in fact believed and should have known that they were dealing with a homeowner. This is a person who, once inside the residence, they knew there was a person there, but unlike a burglar, instead of taking the TV, the homeowner had turned the TV on and was watching it. Unlike a burglar who might try to distract the dog with a piece of meat, the homeowner is talking to the dog by name and encouraging him to behave aggressively towards the people outside the home. So when the officers make contact with the person inside the home, they have to do so with their own safety in mind, but they also have to do so with the safety of the person who they know is probably a homeowner in mind. What specifically did the officers do or fail to do that creates a violation of 1983? They failed to announce their presence consistently with the Fourth Amendment. Did they ever go inside the house? No, but they lured the homeowner outside the home, and that's the same type of intrusion. Does the knock and notice rule apply to events outside the house? If police are trying to lure a homeowner outside the home, the knock and announce rule should announce. We can't have American law enforcement officers dressing up as UPS men and saying they need a package signature. And in this case, the did essentially that. They played a game of ding dong ditch where they're knocking on the front door and then hiding out of the presence. So that's the first thing. The second thing is that once they've created the situation where the homeowner comes out of the home, unaware of who it is that he's dealing with, in those circumstances, the Fourth Amendment requires them to give the person on the porch a full and fair opportunity to understand who they are, meaning that they're law enforcement officers, and more importantly, what they want him to do, which is to drop the gun. And the record in this case was clear that there was not enough time on the clock to do that, because within about six seconds, the dispatcher, one officer said, this person is coming to the door. And within the scope of six seconds, he was able to come to the door, open the door. The officer started yelling, gun, gun, gun. And then 18 rounds are fired. And then in that period of time, the officer's back on the radio saying shots have been fired. So while the respondent and the city of Everett at the district court level tried to make it seem like there was this big, long exchange where they said, police dropped the gun, one, that's a disputed issue of fact, and two, there's simply not enough time for the picture they want to paint to have developed for this young man. And I would hasten to point out to this court, the thing that really strikes us about the case and the reason we wanted to pursue it is that there's no reasonable explanation for why Mr. Willard would choose to point his firearm at police officers if he knew they were police officers. This is a gentleman with no criminal history. This is a gentleman who has committed no crime. This is a gentleman who does not have a suicide wish or a death wish. The only plausible explanation for the factual scenario that unfolded that morning at 1.30 a.m. is that he came out onto his front porch expecting to find trespassers, thieves, or vandals, was surprised to hear yelling coming from different corners of his yard, and before he had a chance to appreciate what was going on, had been aerated like a piece of Swiss cheese. That's not consistent with the United States Constitution. It's not consistent with the Washington state constitution. And in that moment, he was denied his fourth and 14th amendment rights. But what information did the police officers have that brought them to the house? They had a call of a, quote unquote, possible burglary in the neighborhood. They did not have, I don't believe, an address. And when they approached and surrounded the home, I submit to this court, they found no evidence consistent with the burglary in progress. The one reference to anything that might even remotely be consistent with the burglary is a muddy shoe print. And if this court looks at the record for the officer that says there was a muddy shoe print, it's at the bottom of the door, which in common sense understanding is not consistent with someone trying to kick in a door. It's consistent with a dirty door that someone has grazed with their shoe. And they had an inordinate amount of evidence that told them this was the homeowner. Lights on, a TV on, talking to the dog, and more importantly, when the officers knocked on the door and made noise at the front porch, he came out. This isn't a suspect fleeing from the back of the building and trying to run through the alley. He came out onto his front porch with the porch light on. So there's a pile of evidence on one side of the scenario that any reasonable officer, and Judge O'Scanlan's correct, that's how we judge the situation. Any reasonable officer would look at it and say, this is probably a homeowner. And there's no evidence other than the originating call from a neighbor about a potential burglary to suggest that the person in the home is anything but the homeowner. I may have misunderstood you. I thought you said that there was some contact between the while he was still in the house. That's not in the record. I misunderstood that. There was no contact. And our position, Your Honor, is that there should have been. No one called in, called the number? No one called in. No one called the reporting party back to get more information. Nobody got on the bullhorn or on the overhead and said, Hey, this is the Everett Police Department. We're surrounding the home. You know, you need to come out with your hands up. None of those steps were taken. And the police never identified themselves as law enforcement officers. You've taken the position that when Mr. Willard came out, he had the gun raised up, pointing up instead of at the officers. But isn't the record evidence that at one point he leveled leveled the gun in the in the direction, general direction of the officers, that it came down from being pointed at the sky to being pointed in a more perpendicular position toward the officers? There is some evidence to that fact. There's some evidence. I believe it's the excerpts of the record at 38 through 40 from I believe it's Officer Franklin. Who said the gun was extended directly out, neither up nor down. But I believe he refers to it being in around the deceased's hips around Mr. Willard's hips, which unless you're in the movies is not how you would fire a shotgun. So I think that's a disputed issue of fact. And what I would say in response to the question or what I think is the underlying purpose of the question, Your Honor, is this whether or not Mr. Willard volitionally pointed the gun in the direction of the question than whether he knowingly pointed it at a police officer. So just for an example from a different type of case, in a fish and wildlife case, if there's an armed officer out in the woods in a hunting area and he's rustling around in the bushes and a hunter trains a gun towards that fish and wildlife officer, that officer might have a person intentionally pointing a firearm at him. But his obligation under the federal and state constitutions and basic principles of common sense is not to start yelling gun, gun, gun and firing back. It's to say, hey, this is a fish and wildlife officer over here. Don't shoot. You need to lower your weapon. And to give the person on the other end of the hunting rifle a full and fair opportunity to appreciate the situation and comply with those commands. And that's what was not done in Mr. Willard's case. There obviously is a difference between a constitutional violation and negligence. What's the status of any potential negligence claims against the police department? Well, those were erroneously dismissed by the district court as well on summary judgment. And we're asking for reversal of that portion of the order as well. The district court erroneously concluded that the Washington state waiver of sovereign immunity is somehow limited by the public duty doctrine. And what I want to be clear about to this court is that the public duty doctrine is really only used in circumstances of inactive negligence or failure to act. The public duty doctrine does not bar claims for negligence where the tortfeasor, government agency or agent is actively creating dangers to members of the public. In preparing for today's argument, I did find one other case that I wanted to direct the court to on that exact same topic. Have you served your opposing counsel with that case citation yet? What's that? Have you served your opposing counsel with that case citation? I have not. I found it last night, Your Honor. Well, see the deputy clerk before you leave chambers and provide copies to your opposing counsel and to the three of us. I'm happy to do so, Your Honor. The case is the Garnett versus City of Bellevue case. It's reported at 59 Washington app 281. And it's a 1990 case that our Supreme Court declined review of. It involved police officers confronting two women at a motel and accusing them of being prostitutes and so forth and then telling them to get out of town and never come back. With more colorful language than I'll grace this court with. And in the holding, that court of appeals said, we're not applying the public duty doctrine in these circumstances. This isn't a case where the plaintiff is alleging breach of a nebulous duty to the public. These officers were interacting with these two women. And once they did so, they have a duty to do so reasonably. And if you look at the other cases, some of which were cited in our brief, the City of Kelso case, for example, that's our Supreme Court case, making clear that we have one of the most sovereign immunity in the country. And it's a traffic accident case. It's a it's a police officer driving negligently and striking someone else's car. And if you accept the analysis undertaken by the district court and that advanced by the City of Everett, you would go through the public duty doctrine and say, well, there's no expressed assurances. There's not a special relationship here and so forth. So this case can be dismissed. The City of the Kelso case says quite clearly, that's not the law. You don't need to identify an exception to the public duty doctrine when the officers are already interacting with someone. We cited to the Coffell case for that same proposition. Counselor, Judge Gould, if I could interject a question or two. Of course, Your Honor. First of all, I have some problem on the federal constitutional claim because of Supreme Court precedent saying that the officers can use deadly force when they're threatened with death or serious harm. And so to me, it's very, it's very difficult to see a claim proceeding if a guy comes out of his house with a leveled shotgun in the end, it could easily swing an inch or two one way or another and shoot an officer. So it's all very tragic, but it's hard for me to see the federal claim, which leads me to wonder on the state law claim, the negligence claim and the active duty, public duty doctrine, on which I guess the district court dismissed that. If there are any issues here that you think are appropriate for certification to the Washington State Supreme Court, because a lot of what you're arguing has to do with policy of how police interact with homeowners. And they're really questions in the state of Washington that the state Supreme Court can address, whereas we can't. Thank you, Judge Gould. That's a very valid option. I don't believe that's necessary in light of the case law that's already on the books in Washington, talking about the distinction between active negligence and passive negligence, and most notably the Coffell case and the one I cited earlier. With regard to the federal claims, Your Honor, it's a tough case. I think that the Cooper versus Sheehan case from the Fourth Circuit is on point. It talks about the imminent foreseeability of luring a homeowner out of his house in the middle of the night in a country where half of the homes have firearms in them and what can happen in those circumstances. And although there are a lot of cases that talk about officers being free to use deadly force if they feel threatened, I would encourage the court to look at those cases closely. I believe that they all, without question, involve a circumstance where it should be obvious to the person threatening the officers that they're dealing with the police. I'd like to reserve my remaining time for rebuttal. You may do so, Counsel. Thank you. We'll hear from the city. May it please the court. I'm Lou Peterson. I'm Hillis Clark Martin and Peterson. With me at counsel table are my colleagues, Murray Crego Peterson and Jake Ewert, both of whom have been involved in this case from the start. Let's go right to the public duty doctrine. There's no reason to certify to the Washington Supreme Court because the Washington Supreme Court has made it abundantly clear that the public duty doctrine is alive and well. The Munich case, Munich versus Skagit Emergency Communications Center in 2012, is the best exposition of those views. That's like an elaborate decision by Justice Farrar's, right? Yes. There was a... Justice Chambers. Correct. Is there no issue left open by all of that? I believe... ...profitably be certified here? I believe there's no issue left open. The concurrence by Justice Chambers was joined in by four other justices. So we have a majority concurrence in addition to a unanimous decision. And in that decision, the court does a nice job of reviewing the case that has existed from the time of the end of sovereign immunity through 2012. In addition to that, Your Honors, our state Supreme Court in Chambers-Castains versus King County in 1983 stated specifically that duties to provide police protection are owed to the public at large and are unenforceable as to individual members of the public. And furthermore, 1994 in the Keats versus City of Vancouver case, another public duty case, our state appellate court said as a general rule, law enforcement activities are not reachable in negligence in Washington. Judge Zille below applied the right standard here, and that was to look at what the police activity was of the evening. It was an exercise of the general police power, the investigation of a 911 call of a possible burglary in progress. When police are engaged in that kind of a response, the public duty doctrine provides that there is no duty to anyone but the general public, unless one of four exceptions applies. The only exception that arguably could apply here is the special relationship exception, that is the exception that comes into play in cases like Munich, where there's a response to a 911 call to the very person who's in trouble, who's been threatened by something. And that can develop privity and express insurances of help and justifiable reliance, which are the three elements of the exception. Here, no exception applies because the police owed no individualized duty to Mr. Willard. They owed a duty to the general public. So under Washington law, there's no negligence. Here's what's perhaps most important, is that under the undisputed facts of this case, there's no negligence, there's no Fourth Amendment problem, there is no misconduct whatsoever. The record in this case makes abundantly clear that these facts are undisputed. A 911 call reports a burglary in progress at the Willard House. Uniformed police arrive and quietly approach the house. The police knock on the front door. A man, by the way, not known to be anybody in particular to the police, who, by the way, are often threatened when responding to problems at homes. And this court has remarked more than once with respect to the dangers that police officers face when they're responding to problems at residences. A man opens the door, steps onto the porch, carrying a shotgun with the barrel pointed up. The police announce, police drop the gun. The testimony is that at least two of the police officers yelled police, several yelled drop the gun. The man with the shotgun turns and levels it at the police officers, most particularly at Officer Harney and Officer Showalter. Officer Harney is four to five feet away from him. He testified that he leveled it at my chest. He looked at me and I looked at him. And he said, I said loudly and clearly, police drop the gun. And then the police fired. Because- What about the relevance of the six seconds you heard your opposing counsel mention? The record below reflected that from the time the door was opening until the shots was between seven and eight seconds. Between seven and eight seconds. In other words, it's the length of time that a world class sprinter runs most of a hundred yard dash. It's the time in which at an ordinary pace you can walk 30 to 35 feet. He came out on the porch. He had police officers fully uniformed with badges on, one of whom, two of whom were within four or five feet of him. And rather than dropping it, he turned and he leveled it at them. There is no case decided by this court or this U.S. Supreme Court that suggests anything other that when the police are threatened with harm, they're entitled to use deadly force. These officers were threatened. They're not required to wait until they're shot. Counsel in his argument raised the notion, well, what could a possible explanation be for this gentleman coming out there and aiming the shotgun at him? This was, who knows, except he had a 0.26 blood alcohol rating. It was a level at which a lot of people are comatose. He had, the testimony was that he spent the evening drinking heavily at local bars. Witnesses have talked about he was drunk, very drunk. He returned home. Likely the 911 call was called in because he couldn't get into his house and he was bashing at the door. When the officers arrived, they saw muddy boot prints on the door, consistent with somebody trying to knock it down. They don't know that it's the homeowner. He owns a lot of weapons. The testimony was he grabbed a loaded shotgun with a 0.26 blood alcohol level and walked out on the porch. That's the explanation. The SMART, there's an independent SMART team that's hired in Snohomish County whenever there's an officer-involved shooting composed of officers. Excuse me, what is a SMART team? It's a Snohomish County response team. It's a group that's been formed to investigate every police shooting. After this police shooting, and it's in the record, the SMART team took dozens of witness interviews, ballistics, and did a lot of other things. A team that's in the record? Yes, and they made a full report to the Snohomish County prosecutor as a standard practice whenever there's an officer-involved shooting. Can we go back for just a minute? As I read the record and as I read the brief, the gist of the negligence action is an accusation that negligence actually preceded Mr. Willard's appearance on the doorstep. I mean, maybe it goes beyond that, but many of the negligence allegations here are that the police should have done things prior to the time that he presented himself. We talked in your opponent's argument about, for example, calling in first, having the police dispatcher call into the home. Did the police, is there any record evidence of that? Did the police have the ability to know what the phone number was and to call in when they, for example, had heard voices, heard a man talking to the dog? There's a very good reason why, under Fourth Amendment law, this court has been very specific to state that the issue is not about good or bad tactics. It's not about choosing, in hindsight, 2020 hindsight, the best alternative. It's putting yourself in the position of a police officer making decisions on the ground and investigating. The testimony in this case is that these police officers arrived at a reported burglary in progress. They approached the house, examined the perimeter. A couple of them heard a dog barking in the yard, a voice, but they couldn't tell what was said. They observed the porch light was on. They observed there was a light on inside. They didn't see anybody. At least one could hear television on. Again, who knows what that means? As the police officers testified, it might be the homeowner inside. It might be someone else. It might be no one inside. Lights and television don't necessarily reflect any of that. They didn't see anybody inside. They made a determination. Step one in investigating what's going on is knock on the door. The homeowner comes out and says, what's up? They say, hey, are you okay? Is there any problem? And life goes on. For negligence, there has to be a breach of a standard of care of some sort. One reason we know that the public duty doctrine in Washington applies here so there's no duty and no negligence claim is that the notion of sovereign immunity was to put the state and county and city and police in the same position as an ordinary citizen for a lot of purposes. For example, premises liability by the county. Same position now as they would be with an ordinary citizen. An ordinary citizen is not entrusted with investigating burglaries in progress. So there's no standard of care out there for what an ordinary citizen would do. And the law in this state is if there's a duty, it's the same duty as the ordinary citizen. And the rationale of the cases in the state of Washington for public duty doctrine in police activities is precisely that. The police have a generalized duty to the public. And they only take on a responsibility and a duty to an individual in very special circumstances. For example, the Washburn case, which is cited by a plaintiff appellant to this case. Washburn case, our court said, look, in serving an anti-harassment order, our statute makes a very specific duty to the person who's having the order served. There's an exception. One of the four exceptions to public duty doctrine is the legislative intent exception. So therefore, court, unlike what counsel is saying, public duty doctrine is dead, very much alive. And in that case, Washburn case, our court applied it and found the legislative intent. Munich and other 911 calls where there's some kind of a problem in response, there can be a special relationship developed between the police department or city and the individual because they've called, they have privity, there have been assurances made, and then there's been some kind of a justifiable reliance and negligence. Here, there's no such thing. Here, there's no such thing. And there's no dispute about the facts that I've stated. It's hard to imagine a more plain vanilla approach and cautious approach to an investigation of an unknown potential burglary in progress than simply knocking at the door. No private citizen would ever be charged with anything or found liable in tort for knocking on the door, and no police officer should be. Wilson v. Arkansas and its progeny are all about knocking and announcing when you're entering. There's no case that says a police officer can't knock on the door in carrying out his or her reasonable duties. No case. In appellant's brief, they wrongly state a lot of things. And one of the things I wanted to point out for sure is they wrongly state in their brief that there's a dispute of material fact with respect to whether that shotgun was aimed at the police. In the district court, they were asked by Judge Zille repeatedly whether they had any evidence of that, because he wanted to fulfill his duty as a district court judge to make sure there's not objective evidence that calls that into question. Because when a gun is pointed at a police officer, it's unequivocally clear that officer's entitled to shoot. They had nothing to present. Once the summary judgment decision was made and they lost, they moved for reconsideration and they supplied a raft of materials. Not before the district court, not properly before this court. Judge Zille, when he denied the motion for reconsideration, though he evidenced he looked at that. And there's a reason that they didn't provide those materials to Judge Zille in the first instance, because they don't support their case. And they have misstated in their brief. They say, for example, that their ballistics expert, Matthew Nodell, has testified that it's not possible that the gun was aimed at the police. His testimony couldn't be farther from that. He testified unequivocally it's not possible for him to know where the barrel was pointed. That's what he said. They've flipped it exactly 180 degrees. So the one thing I want to emphasize with this court is these facts that I recited, these facts, coming out with a gun, holding it up, leveling it at the officers, they're unequivocally undisputed. And furthermore, Mr. Nodell, who in his deposition, which I took, he recognized during that deposition that his expert report was wrong. And he issued a revised report. And in that revised report, his ballistics show that the body of Mr. Willard, when he was shot in the chest from the front, was aimed precisely at where officers Harney and Showater were standing, a few feet away. And his ballistics report then showed that he took shots from the side from Officer Radosevich, who was standing precisely off to the side. And so everything about his ballistics report and his testimony is entirely consistent with the undisputed fact that that shotgun was leveled at the police officers. And furthermore, Officer Franklin, whose testimony they failed to produce below until motion reconsideration, he stated unequivocally in that testimony that when Mr. Willard came out, he faced directly where Mr. Franklin was, which was right behind where Officer Harney was, because he was across the street. And he was front on with the barrel pointed, leveled and out. Again, 100 percent consistent with Officer Harney, with Officer Showalter, with Officer Radosevich. Thank you, Counsel. Your time has expired. Mr. Roberts, you have some reserve time. Just a few ticks of the clock, if I may, Your Honor. Respond to some of the things Counsel said. First, I want to address this issue that there is no dispute about the statement made allegedly that it was, we are the police, drop the gun. The excerpts from the record at page 46 were that there were commands to, quote, drop it. And they were, quote, were followed without delay by rapid and repeated gunfire from officers. There's the statement of Corey Goldman, the excerpts of the records at 2, 8, 9. The female officer, quote, yelled gun. And then all the officers started yelling, drop the gun, drop the gun, more than once. And then I just heard a whole bunch of firing. And there's, most importantly, the testimony of Officer Franklin, which is at page 40 from the excerpts of the record, where he says there were, quote, only a couple of seconds, quote, couple of seconds between commands and shots fired. And then the supplemental excerpts of the record at 5, 87 through 88, Radosevich yelling gun, gun, gun, and then shots. There's the disputed issue of fact about whether these officers ever announced themselves. And with regard to the ballistics testimony, and that's at the supplemental excerpt of the records at 64, 65, the expert was asked if it was, his analysis was consistent with Mr. Willard leveling the shotgun at Officer Harney. And the answer on page 65 of the excerpts, supplemental excerpts at line 4, I would say the answer is no, because Willard would not have been facing southward down the stairs as Radosevich is shooting him in his back, shoulders, and such, and back of the legs. Thank you, Counsel. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Gould, Burns